JS 44 (Rev. 06)

**CIVIL COVER SHEET**

17-cv-4827

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Elizabeth Goodman

**DEFENDANTS**

Deer Meadows Home Health and Support Services; Deer Meadows Home Health and Support Services, LLC; and BHP Services

17   4827

**(b)** County of Residence of First Listed Plaintiff    Cape May County, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Justin F. Robinette, Esquire
325 Chestnut Street, Suite 800, Philadelphia, PA 19106;
610-212-6649

Attorneys *(If Known)*

Glenn Davis, Esquire/Latsha, Davis & McKenna
1700 Bent Creek Rd., Ste. 140, Mechanicsburg, PA 17050

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | Liability | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| | | | | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | | | | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. s. 12101, et seq. (ADA); 20 U.S.C. s. 2611, et seq. (FMLA)

Brief description of cause:
Disability discrimination in violation of the ADA and FMLA interference/retaliation

## VII. REQUESTED IN COMPLAINT:

- ❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
150,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____

DOCKET NUMBER _____

OCT 27 2017

DATE
10/27/2017

SIGNATURE OF ATTORNEY OF RECORD

*Justin F. Robinette*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



17    4827

# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Elizabeth Goodman, 140 Route 50, Ocean View, NJ 08230

Address of Defendant: Deer Meadows Home Health and Support Services, *et al.*, 8301 Roosevelt Blvd., Philadelphia, PA 19152

Place of Accident, Incident or Transaction: 8301 Roosevelt Blvd., Philadelphia, PA 19152

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

   (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))       Yes☐   No☐

Does this case involve multidistrict litigation possibilities?       Yes☐   No☐

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
       Yes☐   No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
       Yes☐   No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
       Yes☐   No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
       Yes☐   No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

# ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, Justin F. Robinette, Esquire , counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 10/27/17      *Justin F. Robinette*      319829   OCT 27 2017
                Attorney-at-Law              Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/27/17      *Justin F. Robinette*      319829
                Attorney-at-Law              Attorney I.D.#

CIV. 609 (5/2012)



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Elizabeth Goodman | : | CIVIL ACTION |
| v. | : | 17   4827 |
| Deer Meadows Home Health and Support Services, *et al.* | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (X)

| | | |
|---|---|---|
| 10/27/17 | Justin F. Robinette, Esq. | Plaintiff, Elizabeth Goodman |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (610) 212-6649 | (610) 910-3200 | jrobinette@discrimlawyer.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

OCT 27 2017



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH GOODMAN,

Plaintiff,

v.

DEER MEADOWS HOME HEALTH
AND SUPPORT SERVICES; DEER
MEADOWS HOME HEALTH AND
SUPPORT SERVICES, LLC; and BHP
SERVICES,

Defendants

CASE NO. 17 4627

## COMPLAINT

### PARTIES

1.      Plaintiff is an adult individual and citizen of the State of New Jersey who, at all times relevant hereto, resided at 140 Route 50, Ocean View, NJ 08230.

2.      Defendants, Deer Meadows Home Health and Support Services; Deer Meadows Home Health and Support Services, LLC; and/or BHP Services were, at all times relevant hereto, Plaintiff's employers, and each employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

3.      Defendants, Deer Meadows Home Health and Support Services; Deer Meadows Home Health and Support Services, LLC; and BHP Services, at all times relevant hereto, each had their headquarters and principal place of business at 8301 Roosevelt Boulevard, Philadelphia, PA 19152.

4.      Plaintiff's rehire letter stated, "[W]e are most enthusiastic about the prospect of your joining BHP Services," and it states that Plaintiff was "employed by the Company," where "'Company' includes DMHHSS as well as the BHP Services Corporation."

5.     The Deer Meadows Employee Handbook attaches the BHP Services Corporate Compliance Handbook to the conclusion of the Deer Meadows Employee Handbook, and requires employees to review and sign an acknowledgment for both handbooks.

6.     Defendants' Employee Handbook states that a complaint of discrimination may be directed to the Chief Executive Officer of BHP Services.

7.     The "Deer Meadows Home Health and Support Services, LLC Policy and Procedure on Leaves of Absence" indicates that its "author" is "the Human Resources Director [of] BHP Services." The policy states employees should contact the Chief Executive Officer of BHP Services for a leave of absence.

8.     Plaintiff's supervisor who discriminated against her, Stanley Rynkiewicz, was, at all times relevant hereto, the Head Administrator for Deer Meadows Home Health and Support Services and also the Corporate Compliance Officer for BHP Services.

9.     Defendants, Deer Meadows Home Health and Support Services and/or Deer Meadows Home Health and Support Services, LLC, are agents and/or divisions of Defendant, BHP Services.

10.    Defendants are joint or co-employers of Plaintiff.

11.    Defendants are ostensible or apparent employers of Plaintiff.

## JURISDICTION AND VENUE

12.    This Honorable Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the claims present a federal question.

13.    Venue is proper because, at all times relevant hereto, Plaintiff was employed by Defendants within this District at 8301 Roosevelt Boulevard, Philadelphia, PA 19152.

14.    Plaintiff exhausted her administrative remedies. Her Notice of Right-to-Sue is attached hereto as Exhibit "A."

2

## COUNT I:
## WRONGFUL DISCHARGE/TERMINATION BASED ON DISABILITY
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## (FIRST TERMINATION)
### (Plaintiff, Elizabeth Goodman v. Defendants, Deer Meadows Home Health and Support Services; Deer Meadows Home Health and Support Services, LLC; and BHP Services)

15.     All of the foregoing paragraphs are incorporated by reference as if the same were more fully set forth herein at length.

16.     Plaintiff was hired by Defendants as the Director of Community Relations beginning on October 16, 2015.

17.     Plaintiff was qualified for the job, and worked for seven (7) months to the Defendants' satisfaction, until the time she was discharged on May 6, 2016.

18.     Defendants discharged Plaintiff as the Director of Community Relations on May 6, 2016 because Plaintiff was disabled, had a record of a disability, and/or because she was perceived or regarded as disabled, on account of her cancer diagnosis.

19.     In November/December 2015, Plaintiff began having leg pain and broke out in cutaneous lesions on her legs, called prurigo nodularis. Plaintiff was later informed by a dermatologist that her prurigo could be caused by a malignancy/cancer.

20.     In November/December 2015, Plaintiff asked one of the nurses on staff at Defendants' healthcare facility to take a look at Plaintiff's legs for her. Clinical Director and Assistant Administrator, Irene Dudley, stated to Plaintiff, "Why do you have a need to be sick?" When Plaintiff responded to Dudley that Plaintiff might be sick, Dudley said, "You always have something to complain about."

21.     In or around November/December 2015, Respondents' Head Administrator, Stanley Rynkiewicz, along with Dudley, examined a report for a chest x-ray that Plaintiff had performed to check for tuberculosis. When Dudley saw Plaintiff's chest x-ray, Dudley stated, "She is a mess" and "we should fire her now." Both Dudley and Rynkiewicz laughed.

22.     Plaintiff was diagnosed with squamous cell carcinoma of the vulva following a March 28, 2016 biopsy taken by her gynecologist.  The gynecologist told Plaintiff on March 28, 2016 that he was concerned about the likelihood Plaintiff had vulvar cancer based on the fact that there was a lump on Plaintiff's vulva, and because Plaintiff had lichen sclerosus, which predisposes women to vulvar cancer.  The gynecologist informed Plaintiff on March 28, 2016 that Plaintiff would need cancer surgery.

23.     Plaintiff's vulvar cancer diagnosis required a partial radical vulvectomy and substantially limits her from having sexual intercourse and using the restroom.

24.     A biopsy also subsequently revealed, on July 17, 2017, that Plaintiff had the diagnosis of squamous cell carcimona, or cancer, of her left leg too.

25.     After being told by her gynecologist about the likelihood she had vulvar cancer on March 28, 2016, Plaintiff returned to work the same day and informed Dudley about her cancer diagnosis and the need for cancer surgery.

26.     On April 1, 2016, Rynkiewicz and Dudley conducted a performance evaluation of Plaintiff noting an alleged performance issue with admissions quotas for the first time.

27.     Plaintiff was scheduled to undergo surgery for her vulvar cancer on Tuesday, May 10, 2016.

28.     Plaintiff requested time off from Rynkiewicz and Dudley on April 21, 2016 for Plaintiff's cancer surgery on May 10, 2016.

29.     Defendants' Employee Handbook provides that all employees may take "sick time" due to "personal illness," may also take up to 30 days of paid leave due to "short term illness," may also take leave under the "Personal Medical Leave" ("PMED") policy, may also take leave under the "Personal Leave of Absence" ("PLOA") policy, and may also take "Paid Time Off" ("PTO"). However, none of these options were provided to Plaintiff so she could have cancer surgery.

30.     On May 6, 2016, the Friday before Plaintiff's surgery the following Tuesday, May 10,

4

2016, Defendants discharged Plaintiff from her position as Director of Community Relations.

31.     Defendants provided Plaintiff a termination letter on May 6, 2016 that stated, "This layoff action is indefinite in duration and should be considered permanent," and "I wish to assure you that your termination is not related to your job performance."

32.     Upon information and belief, Plaintiff's job duties were assumed in May 2016 by Gina Paulino, who was 23-years-old, not disabled, and did not have cancer.

33.     Plaintiff continuously and repeatedly expressed interest in rehire to her former position, to Rynkiewicz and Dudley, in June and July 2016.  Rynkiewicz and Dudley did not respond.

34.     On July 6, 2016, Defendants placed an advertisement online for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

35.     On July 12, 2016, Plaintiff formally applied online for the position of Home Care Account Liaison.

36.     Plaintiff was contacted by Rynkiewicz on July 12, 2016 and Rynkiewicz told Plaintiff that she was one of the candidates under consideration for the new position of Home Care Account Liaison.

37.     Defendants then called Plaintiff on July 14, 2016, and rehired her back in her former position as Director of Community Relations, *not* Home Care Account Liaison.

38.     Plaintiff started working as Director of Community Relations again on July 25, 2016 despite the fact that Defendants previously represented to Plaintiff that her discharge would be "indefinite" and "permanent."

        **WHEREFORE**, Plaintiff, Elizabeth Goodman, demands judgment in her favor and against Defendants, in an amount that will compensate Plaintiff for back pay and benefits for the time period of May 6, 2016 through July 25, 2016; compensatory damages for past medical expenses and any other debts incurred due to a lack of income from May 6, 2016 through July

25, 2016; pain and suffering, anxiety, mental anguish, humiliation, loss of life's pleasures, inconvenience, and emotional distress on account of being forced to fight discrimination on top of cancer, and for being discharged and left without any income during the critical time period of her cancer diagnosis and treatment from May 2016 through July 2016; punitive damages; equitable relief requiring Defendants to post notice of the verdict in this matter at 8301 Roosevelt Boulevard; and reasonable attorneys' fees, expert witness fees, and costs.

**COUNT II:**
**WRONGFUL DISCHARGE/TERMINATION BASED ON DISABILITY**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(SECOND TERMINATION)**
**(Plaintiff, Elizabeth Goodman v. Defendants, Deer Meadows Home Health and Support**
**Services; Deer Meadows Home Health and Support Services, LLC; and BHP Services)**

39.     All of the foregoing paragraphs are incorporated by reference as if the same were more fully set forth herein at length.

40.     After rehiring Plaintiff on July 25, 2016, Defendants discharged Plaintiff again on November 28, 2016 because she was disabled, had a record of a disability, and/or because she was perceived or regarded as disabled, on account of her cancer diagnosis.

41.     On or about July 14, 2016, Rynkiewicz called Plaintiff and told her that after reinstatement as the Director of Community Relations, Plaintiff should expect to receive a bonus if she received ten (10) referrals per month.

42.     Then, on July 15, 2016, Rynkiewicz sent Plaintiff a new Job Description which included one (1) new "essential job function" – that the Plaintiff would be "directly responsible for obtaining a minimum of 12-15 new referrals a month."

43.     On July 17, 2016, Plaintiff brought up with Rynkiewicz that the number had changed from 10 referrals originally, to 12-15 referrals.  Plaintiff was assured by Rynkiewicz on July 18, 2016 that the number was actually ten (10).

44.     On July 17, 2016, Plaintiff brought up with Rynkiewicz that he had previously stated that

6

the ten (10) referrals were for a bonus, rather than a requirement.  Plaintiff was also assured by Rynkiewicz, on July 18, 2016, that the referrals were not a job requirement, but instead were simply a goal to achieve a bonus.

45.     Rynkiewicz stated that Plaintiff was required to sign and accept the new Job Description in order to be rehired to her position as Director of Community Relations.  Plaintiff therefore signed for the new Job Description on July 18, 2016, despite the discrepancy in what was provided about the referrals in writing versus verbally.

46.     Immediately after Plaintiff started on July 25, 2016, and continuing repeatedly until Plaintiff's termination, Dudley would ask Plaintiff, "How's your energy level?" generally, "How's your energy level today?", and "How's your energy level?" for a specific assignment.

47.     Plaintiff was told by her oncologist at her 4-month follow-up oncology appointment, on October 6, 2016, that she had a possible recurrence of cancer because the oncologist stated she saw irregular cells and areas that might be malignant using comparison images.

48.     Plaintiff told Dudley that Plaintiff wanted to talk with her about a recent development in Plaintiff's health on October 20, 2016.

49.     Plaintiff discussed with Dudley, on October 20, 2016, that she wanted to take "FMLA" for multiple upcoming appointments, which would then determine if Plaintiff truly had a recurrence of cancer and would require a second surgery.

50.     Upon information and belief, on October 20, 2016, Dudley informed Rynkiewicz that Plaintiff had a recurrence in her cancer.

51.     On October 20, 2016, less than three (3) hours after Plaintiff notified Dudley about the recurrence of her cancer, Rynkiewicz emailed Plaintiff and cc'ed Dudley asking about the number of patient referrals for the week.

52.     The next day, on October 21, 2016, Rynkiewicz sent Plaintiff an email saying Plaintiff was given a directive that she was expected to get 10 new patients by the end of the month, and

7

told that she did not get any referrals that converted to a patient as of that point in October.

53.     Having not received a response to her FMLA request, on November 4, 2016, Plaintiff asked Dudley whether she was approved for FMLA.  Dudley stated to Plaintiff that she was not eligible for FMLA because Dudley calculated Plaintiff's start date from the date of her rehire in July 2016, as opposed to the original date of hire in May 2015.

54.     The same day, on November 4, 2016, Rynkiewicz and Dudley placed Plaintiff on an Action Plan, to last 30 days, or until December 4, 2016.

55.     Also on the same day, November 4, 2016, Defendants again placed the advertisement for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

56.     On November 23, 2016, Plaintiff was provided a performance review, her probationary period was extended for thirty days, and she was told that she would be reevaluated at the end of the 30 days.

57.     On November 23, 2016, Plaintiff was told to return her performance evaluation signed, by November 28, 2016.

58.     On November 25, 2016, Plaintiff complained about cancer discrimination by Dudley and Rynkiewicz, to the Compliance Officer, Benjamin Treital, who indicated he was the proper person to accept Plaintiff's complaint.

59.     On the morning of November 28, 2016, Plaintiff memorialized her complaint of cancer discrimination in an e-mail to Mr. Treitel with the subject line, "Descrimination [*sic.*] Complaint."  Plaintiff wrote in the e-mail to Mr. Treital on November 28, 2016, "I feel that I am being discriminated against and pushed out because of my cancer diagnosis."

60.     Plaintiff was terminated by Rynkiewicz and Dudley on the afternoon of November 28, 2016.

61.     The reason that Dudley and Rynkiewicz provided for Plaintiff's discharge, on November

8

28, 2016, was that Plaintiff allegedly failed to meet the required number of referrals provided in the new Job Description.

62.     A termination letter was not provided to Plaintiff at the time of her termination on November 28, 2016. After the meeting on November 28, 2016, Plaintiff sent an e-mail to Rynciewikz and Dudley asking for a termination letter that confirmed Defendants were terminating Plaintiff for allegedly not meeting the required number of referrals provided in the new Job Description.

63.     On November 29, 2016, Defendants provided Plaintiff a termination letter, which changed the reason for her termination to include that Plaintiff was also being terminated for "failure to follow professional and courteous standards of conduct" and "conduct, including disrespect to any employee or other."

64.     However, in the Plaintiff's November 4, 2016 Action Plan, Defendants stated that, "Elizabeth always displays a friendly and positive attitude with staff and others in the community. Elizabeth is a professional, she promotes our agency in a positive manner in the community."

65.     Dudley and Rynkiewicz further stated in Plaintiff's termination letter that Plaintiff did not sign and return a performance review by November 25, 2016. This is false because Dudley told Plaintiff to sign and return the performance review by November 28, 2016.

66.     Dudley and Rynkiewicz also stated in Plaintiff's termination letter that she did not bring in a copy of her schedule on November 28, 2016. This is false, because Plaintiff did bring a handwritten copy of my schedule to the November 28, 2016 meeting.

67.     Plaintiff's termination letter stated that one of the "date(s) and time(s) of incident" consisted of "7/15/16," the date that Defendants rehired Plaintiff as Director of Community Relations. The new essential job function in Plaintiff's new Job Description was used as a pretext to set her up for termination.

9

68.     Although Plaintiff was on an Action Plan that was set to expire on December 4, 2016, and her November 23, 2016 performance evaluation stated that she would be reevaluated after 30 days, Plaintiff was instead terminated five (5) days later, before the Action Plan expired and without ever being reevaluated.

69.     No final warning or suspension was ever provided to Plaintiff, although this was available as progressive discipline to other employees instead of termination.

70.     Upon information and belief, Plaintiff's duties were assumed in part by Gina Paulino in November 2016 after Plaintiff's termination.  Ms. Paulino is 23 years old, is not disabled, and does not have cancer.

71.     In the alternative, upon information and belief, Defendants replaced the Plaintiff with Riley Roberts, who is not disabled and does not have cancer.

72.     Similarly situated employees, like Ms. Paulino, were not terminated despite being on an Action Plan, and despite not achieving 12-15 referrals each month.

**WHEREFORE,** Plaintiff, Elizabeth Goodman, demands judgment in her favor and against Defendants, in an amount that will compensate Plaintiff for back pay and benefits from the time period of November 28, 2016 to the present; front pay and benefits; compensatory damages for past medical expenses and any other debts incurred due to a lack of income from November 28, 2016 to the present; pain and suffering, anxiety, mental anguish, humiliation, loss of life's pleasures, inconvenience, and emotional distress on account of being forced to fight discrimination on top of cancer, and for being discharged and left without necessary income during the critical time period of her cancer diagnosis and treatment; punitive damages; and injunctive relief requiring Defendants to reinstate Plaintiff; to provide Plaintiff back seniority and any promotions she would have received; and to place Plaintiff in the highest appropriate position and salary range, were it not for Defendants' discrimination; an injunction for Defendants to rescind the non-compete agreement that Plaintiff was required to sign upon

10

accepting rehire in July 2016 which requires that Plaintiff not be employed or render services, directly or indirectly, against any organization that provides any services which are the same or similar to Defendants' services within a ten (10) mile radius of three (3) organizations in Philadelphia and one (1) in Bristol; an injunction requiring Defendants to remove any record of Plaintiff's termination from her personnel file; equitable relief requiring Defendants to post notice of the verdict in this matter at 8301 Roosevelt Boulevard; and reasonable attorneys' fees, expert witness fees, and costs.

## COUNT III:
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (FIRST TERMINATION)
### (Plaintiff, Elizabeth Goodman v. Defendants, Deer Meadows Home Health and Support Services; Deer Meadows Home Health and Support Services, LLC; and BHP Services)

73.     All of the foregoing paragraphs are incorporated by reference as if the same were more fully set forth herein at length.

74.     Defendants discharged Plaintiff in retaliation for her request for a reasonable accommodation under the Americans with Disabilities Act ("ADA") in the form of time off to have cancer surgery.

75.     In or around November/December 2015, Respondents' Head Administrator, Stanley Rynkiewicz, along with Dudley, examined a report for a chest x-ray that Plaintiff had performed to check for tuberculosis. When Dudley saw Plaintiff's chest x-ray, Dudley stated, "She is a mess" and "we should fire her now." Both Dudley and Rynkiewicz laughed.

76.     Plaintiff was diagnosed with squamous cell carcinoma of the vulva following a March 28, 2016 biopsy taken by her gynecologist. The gynecologist told Plaintiff on March 28, 2016 that he was concerned about the likelihood Plaintiff had vulvar cancer based on the fact that there was a lump on Plaintiff's vulva, and because Plaintiff had lichen sclerosus, which predisposes women to vulvar cancer. The gynecologist informed Plaintiff on March 28, 2016 that Plaintiff would need cancer surgery.

11

77.     Plaintiff's vulvar cancer diagnosis required a partial radical vulvectomy and substantially limits her from having sexual intercourse and using the restroom.

78.     A biopsy also subsequently revealed, on July 17, 2017, that Plaintiff had the diagnosis of squamous cell carcimona, or cancer, of her left leg too.

79.     After being told by her gynecologist about the likelihood she had vulvar cancer on March 28, 2016, Plaintiff returned to work the same day and informed Dudley about her cancer diagnosis and the need for cancer surgery.

80.     On April 1, 2016, Rynkiewicz and Dudley conducted a performance evaluation of Plaintiff noting an alleged performance issue with admissions quotas for the first time.

81.     Plaintiff was scheduled to undergo surgery for her vulvar cancer on Tuesday, May 10, 2016.

82.     Plaintiff requested time off from Rynkiewicz and Dudley on April 21, 2016 for Plaintiff's cancer surgery on May 10, 2016.

83.     Defendants' Employee Handbook provides that all employees may take "sick time" due to "personal illness," may also take up to 30 days of paid leave due to "short term illness," may also take leave under the "Personal Medical Leave" ("PMED") policy, may also take leave under the "Personal Leave of Absence" ("PLOA") policy, and may also take "Paid Time Off" ("PTO"). However, none of these options were provided to Plaintiff so she could have cancer surgery.

84.     On May 6, 2016, the Friday before Plaintiff's surgery the following Tuesday, May 10, 2016, Defendants discharged Plaintiff from her position as Director of Community Relations.

85.     Defendants provided Plaintiff a termination letter on May 6, 2016 that stated, "This layoff action is indefinite in duration and should be considered permanent," and "I wish to assure you that your termination is not related to your job performance."

86.     Upon information and belief, Plaintiff's job duties were assumed in May 2016 by Gina Paulino, who was 23-years-old, not disabled, and did not have cancer.

87.     Plaintiff continuously and repeatedly expressed interest in rehire to her former position, to Rynkiewicz and Dudley, in June and July 2016.  Rynkiewicz and Dudley did not respond.

88.     On July 6, 2016, Defendants placed an advertisement online for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

89.     On July 12, 2016, Plaintiff formally applied online for the position of Home Care Account Liaison.

90.     Plaintiff was contacted by Rynkiewicz on July 12, 2016 and Rynkiewicz told Plaintiff that she was one of the candidates under consideration for the new position of Home Care Account Liaison.

91.     Defendants then called Plaintiff on July 14, 2016, and rehired her back in her former position as Director of Community Relations, *not* Home Care Account Liaison.

92.     Plaintiff started working as Director of Community Relations again on July 25, 2016 despite the fact that Defendants previously represented to Plaintiff that her discharge would be "indefinite" and "permanent."

**WHEREFORE**, Plaintiff, Elizabeth Goodman, demands judgment in her favor and against Defendants, in an amount that will compensate Plaintiff for back pay and benefits for the time period of May 6, 2016 through July 25, 2016; compensatory damages for past medical expenses and any other debts incurred due to a lack of income from May 6, 2016 through July 25, 2016; pain and suffering, anxiety, mental anguish, humiliation, loss of life's pleasures, inconvenience, and emotional distress on account of being forced to fight retaliation on top of discrimination and cancer, and being discharged and left without any income during the critical time period of her cancer diagnosis and treatment from May 2016 through July 2016; punitive damages; equitable relief requiring Defendants to post notice of the verdict in this matter at 8301 Roosevelt Boulevard; and reasonable attorneys' fees, expert witness fees, and costs.

## COUNT IV:
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (SECOND TERMINATION)
### (Plaintiff, Elizabeth Goodman v. Defendants, Deer Meadows Home Health and Support Services; Deer Meadows Home Health and Support Services LLC; and BHP Services)

93.     All of the foregoing paragraphs are incorporated by reference as if the same were more fully set forth herein at length.

94.     After rehiring Plaintiff on July 25, 2016, Defendants discharged Plaintiff again on November 28, 2016 because she was disabled, had a record of a disability, and/or because she was perceived or regarded as disabled, on account of her cancer diagnosis.

95.     On or about July 14, 2016, Rynkiewicz called Plaintiff and told her that after reinstatement as the Director of Community Relations, Plaintiff should expect to receive a bonus if she received ten (10) referrals per month.

96.     Then, on July 15, 2016, Rynkiewicz sent Plaintiff a new Job Description which included one (1) new "essential job function" – that the Plaintiff would be "directly responsible for obtaining a minimum of 12-15 new referrals a month."

97.     On July 17, 2016, Plaintiff brought up with Rynkiewicz that the number had changed from 10 referrals originally, to 12-15 referrals.  Plaintiff was assured by Rynkiewicz on July 18, 2016 that the number was actually ten (10).

98.     On July 17, 2016, Plaintiff brought up with Rynkiewicz that he had previously stated that the ten (10) referrals were for a bonus, rather than a requirement.  Plaintiff was also assured by Rynkiewicz, on July 18, 2016, that the referrals were not a job requirement, but instead were simply a goal to achieve a bonus.

99.     Rynkiewicz stated that Plaintiff was required to sign and accept the new Job Description in order to be rehired to her position as Director of Community Relations.  Plaintiff therefore signed for the new Job Description on July 18, 2016, despite the discrepancy in what was provided about the referrals in writing versus verbally.

14

100.    Immediately after Plaintiff started on July 25, 2016, and continuing repeatedly until Plaintiff's termination, Dudley would ask Plaintiff, "How's your energy level?" generally, "How's your energy level today?", and "How's your energy level?" for a specific assignment.

101.    Plaintiff was told by her oncologist at her 4-month follow-up oncology appointment, on October 6, 2016, that she had a possible recurrence of cancer because the oncologist stated she saw irregular cells and areas that might be malignant using comparison images.

102.    Plaintiff told Dudley that Plaintiff wanted to talk with her about a recent development in Plaintiff's health on October 20, 2016.

103.    Plaintiff discussed with Dudley, on October 20, 2016, that she wanted to take "FMLA" for multiple upcoming appointments, which would then determine if Plaintiff truly had a recurrence of cancer and would require a second surgery.

104.    Upon information and belief, on October 20, 2016, Dudley informed Rynkiewicz that Plaintiff had a recurrence in her cancer.

105.    On October 20, 2016, less than three (3) hours after Plaintiff notified Dudley about the recurrence of her cancer, Rynkiewicz emailed Plaintiff and cc'ed Dudley asking about the number of patient referrals for the week.

106.    The next day, on October 21, 2016, Rynkiewicz sent Plaintiff an email saying Plaintiff was given a directive that she was expected to get 10 new patients by the end of the month, and told that she did not get any referrals that converted to a patient as of that point in October.

107.    Having not received a response to her FMLA request, on November 4, 2016, Plaintiff asked Dudley whether she was approved for FMLA.  Dudley stated to Plaintiff that she was not eligible for FMLA because Dudley calculated Plaintiff's start date from the date of her rehire in July 2016, as opposed to the original date of hire in May 2015.

108.    The same day, on November 4, 2016, Rynkiewicz and Dudley placed Plaintiff on an Action Plan, to last 30 days, or until December 4, 2016.

109.    Also on the same day, November 4, 2016, Defendants again placed the advertisement for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

110.    On November 23, 2016, Plaintiff was provided a performance review, her probationary period was extended for thirty days, and she was told that she would be reevaluated at the end of the 30 days.

111.    On November 23, 2016, Plaintiff was told to return her performance evaluation signed, by November 28, 2016.

112.    On November 25, 2016, Plaintiff complained about cancer discrimination by Dudley and Rynkiewicz, to the Compliance Officer, Benjamin Treital, who indicated he was the proper person to accept Plaintiff's complaint.

113.    On the morning of November 28, 2016, Plaintiff memorialized her complaint of cancer discrimination in an e-mail to Mr. Treitel with the subject line, "Descrimination [*sic.*] Complaint."  Plaintiff wrote in the e-mail to Mr. Treital on November 28, 2016, "I feel that I am being discriminated against and pushed out because of my cancer diagnosis."

114.    Plaintiff was terminated by Rynkiewicz and Dudley on the afternoon of November 28, 2016.

115.    The reason that Dudley and Rynkiewicz provided for Plaintiff's discharge, on November 28, 2016, was that Plaintiff allegedly failed to meet the required number of referrals provided in the new Job Description.

116.    A termination letter was not provided to Plaintiff at the time of her termination on November 28, 2016.  After the meeting on November 28, 2016, Plaintiff sent an e-mail to Rynciewikz and Dudley asking for a termination letter that confirmed Defendants were terminating Plaintiff for allegedly not meeting the required number of referrals provided in the new Job Description.

16

117.    On November 29, 2016, Defendants provided Plaintiff a termination letter, which

changed the reason for her termination to include that Plaintiff was also being terminated for

"failure to follow professional and courteous standards of conduct" and "conduct, including

disrespect to any employee or other."

118.    However, in the Plaintiff's November 4, 2016 Action Plan, Defendants stated that,

"Elizabeth always displays a friendly and positive attitude with staff and others in the

community.  Elizabeth is a professional, she promotes our agency in a positive manner in the

community."

119.    Dudley and Rynkiewicz further stated in Plaintiff's termination letter that Plaintiff did not

sign and return a performance review by November 25, 2016.  This is false because Dudley told

Plaintiff to sign and return the performance review by November 28, 2016.

120.    Dudley and Rynkiewicz also stated in Plaintiff's termination letter that she did not bring

in a copy of her schedule on November 28, 2016.  This is false, because Plaintiff did bring a

handwritten copy of my schedule to the November 28, 2016 meeting.

121.    Plaintiff's termination letter stated that one of the "date(s) and time(s) of incident"

consisted of "7/15/16," the date that Defendants rehired Plaintiff as Director of Community

Relations.  The new essential job function in Plaintiff's new Job Description was used as a

pretext to set her up for termination.

122.    Although Plaintiff was on an Action Plan that was set to expire on December 4, 2016,

and her November 23, 2016 performance evaluation stated that she would be reevaluated after 30

days, Plaintiff was instead terminated five (5) days later, before the Action Plan expired and

without ever being reevaluated.

123.    No final warning or suspension was ever provided to Plaintiff, although this was

available as progressive discipline to other employees instead of termination.

124.    Upon information and belief, Plaintiff's duties were assumed in part by Gina Paulino in

17

November 2016 after Plaintiff's termination.  Ms. Paulino is 23 years old, is not disabled, and does not have cancer.

125.    In the alternative, upon information and belief, Defendants replaced the Plaintiff with Riley Roberts, who is not disabled and does not have cancer.

126.    Similarly situated employees, like Ms. Paulino, were not terminated despite being on an Action Plan, and despite not achieving 12-15 referrals each month.

**WHEREFORE,** Plaintiff, Elizabeth Goodman, demands judgment in her favor and against Defendants, in an amount that will compensate Plaintiff for back pay and benefits from the time period of November 28, 2016 to the present; front pay and benefits; compensatory damages for past medical expenses and any other debts incurred due to a lack of income from November 28, 2016 to the present; pain and suffering, anxiety, mental anguish, humiliation, loss of life's pleasures, inconvenience, and emotional distress on account of being forced to fight retaliation on top of discrimination and cancer, and being discharged and left without necessary income during the critical time period of her cancer diagnosis and treatment; punitive damages; and injunctive relief requiring Defendants to reinstate Plaintiff; to provide Plaintiff back seniority and any promotions she would have received; and to place Plaintiff in the highest appropriate position and salary range, were it not for Defendants' retaliation; an injunction for Defendants to rescind the non-compete agreement that Plaintiff was required to sign upon accepting rehire in July 2016 which requires that Plaintiff not be employed or render services, directly or indirectly, against any organization that provides any services which are the same or similar to Defendants' services within a ten (10) mile radius of three (3) organizations in Philadelphia and one (1) in Bristol; an injunction requiring Defendants to remove any record of Plaintiff's termination from her personnel file; equitable relief requiring Defendants to post notice of the verdict in this matter at 8301 Roosevelt Boulevard; and reasonable attorneys' fees, expert witness fees, and costs.

## COUNT V
## RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT ("FMLA")
(Plaintiff, Elizabeth Goodman v. Defendants, Deer Meadows Home Health and Support Services;
Deer Meadows Home Health and Support Services, LLC; and BHP Services)

127.    All of the foregoing paragraphs are incorporated by reference as if the same were more fully set forth herein at length.

128.    At all times relevant hereto, each Defendant was engaged in commerce, each was in an industry or activity affecting commerce, and each employed fifty (50) or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

129.    At all times relevant hereto, Plaintiff was employed at a worksite where 50 or more employees were employed by the employer within 75 miles of that worksite.

130.    Plaintiff was hired by Defendants on October 16, 2015, which is the date that her employment began the 12-month accrual for purposes of eligibility under the FMLA.

131.    In November/December 2015, Plaintiff began having leg pain and broke out in cutaneous lesions on her legs, called prurigo nodularis.  Plaintiff was later informed by a dermatologist that her prurigo could be caused by a malignancy/cancer.

132.    In November/December 2015, Plaintiff asked one of the nurses on staff at Defendants' healthcare facility to take a look at Plaintiff's legs for her.  Clinical Director and Assistant Administrator, Irene Dudley, stated to Plaintiff, "Why do you have a need to be sick?"  When Plaintiff responded to Dudley that Plaintiff might be sick, Dudley said, "You always have something to complain about."

133.    In or around November/December 2015, Respondents' Head Administrator, Stanley Rynkiewicz, along with Dudley, examined a report for a chest x-ray that Plaintiff had performed to check for tuberculosis.  When Dudley saw Plaintiff's chest x-ray, Dudley stated, "She is a mess" and "we should fire her now."  Both Dudley and Rynkiewicz laughed.

19

134.    Plaintiff was diagnosed with squamous cell carcinoma of the vulva following a March 28, 2016 biopsy taken by her gynecologist.  The gynecologist told Plaintiff on March 28, 2016 that he was concerned about the likelihood Plaintiff had vulvar cancer based on the fact that there was a lump on Plaintiff's vulva, and because Plaintiff had lichen sclerosus, which predisposes women to vulvar cancer.  The gynecologist informed Plaintiff on March 28, 2016 that Plaintiff would need cancer surgery.

135.    A biopsy also subsequently revealed, on July 17, 2017, that Plaintiff had the diagnosis of squamous cell carcimona, or cancer, of her left leg too.

136.    After being told by her gynecologist about the likelihood she had vulvar cancer on March 28, 2016, Plaintiff returned to work the same day and informed Dudley about her cancer diagnosis and the need for cancer surgery.

137.    On April 1, 2016, Rynkiewicz and Dudley conducted a performance evaluation of Plaintiff noting an alleged performance issue with admissions quotas for the first time.

138.    Plaintiff was scheduled to undergo surgery for her vulvar cancer on Tuesday, May 10, 2016.

139.    Plaintiff notified Dudley and Rynkiewicz on or about April 21, 2016 regarding the May 10, 2016 date of her cancer surgery.  Plaintiff specifically requested "FMLA," and Dudley informed Plaintiff she was not eligible for FMLA.

140.    On May 6, 2016, the Friday before Plaintiff's surgery the following Tuesday, May 10, 2016, Defendants discharged Plaintiff from her position as Director of Community Relations.

141.    Defendants provided Plaintiff a termination letter on May 6, 2016 that stated, "This layoff action is indefinite in duration and should be considered permanent," and "I wish to assure you that your termination is not related to your job performance."

142.    Plaintiff continuously and repeatedly expressed interest in rehire to her former position, to Rynkiewicz and Dudley, in June and July 2016.  Rynkiewicz and Dudley did not respond.

20

143.    On July 6, 2016, Defendants placed an advertisement online for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

144.    On July 12, 2016, Plaintiff formally applied online for the position of Home Care Account Liaison.

145.    Plaintiff was contacted by Rynkiewicz on July 12, 2016 and Rynkiewicz told Plaintiff that she was one of the candidates under consideration for the new position of Home Care Account Liaison.

146.    Defendants then called Plaintiff on July 14, 2016, and rehired her back in her former position as Director of Community Relations, *not* Home Care Account Liaison.

147.    After rehiring Plaintiff on July 25, 2016, Defendants discharged Plaintiff again on November 28, 2016 because she was disabled, had a record of a disability, and/or because she was perceived or regarded as disabled, on account of her cancer diagnosis.

148.    On or about July 14, 2016, Rynkiewicz called Plaintiff and told her that after reinstatement as the Director of Community Relations, Plaintiff should expect to receive a bonus if she received ten (10) referrals per month.

149.    Then, on July 15, 2016, Rynkiewicz sent Plaintiff a new Job Description which included one (1) new "essential job function" – that the Plaintiff would be "directly responsible for obtaining a minimum of 12-15 new referrals a month."

150.    On July 17, 2016, Plaintiff brought up with Rynkiewicz that the number had changed from 10 referrals originally, to 12-15 referrals.  Plaintiff was assured by Rynkiewicz on July 18, 2016 that the number was actually ten (10).

151.    On July 17, 2016, Plaintiff brought up with Rynkiewicz that he had previously stated that the ten (10) referrals were for a bonus, rather than a requirement.  Plaintiff was also assured by Rynkiewicz, on July 18, 2016, that the referrals were not a job requirement, but instead were

simply a goal to achieve a bonus.

152.    Rynkiewicz stated that Plaintiff was required to sign and accept the new Job Description in order to be rehired to her position as Director of Community Relations.  Plaintiff therefore signed for the new Job Description on July 18, 2016, despite the discrepancy in what was provided about the referrals in writing versus verbally.

153.    Immediately after Plaintiff started on July 25, 2016, and continuing repeatedly until Plaintiff's termination, Dudley would ask Plaintiff, "How's your energy level?" generally, "How's your energy level today?", and "How's your energy level?" for a specific assignment.

154.    Plaintiff was told by her oncologist at her 4-month follow-up oncology appointment, on October 6, 2016, that she had a possible recurrence of cancer because the oncologist stated she saw irregular cells and areas that might be malignant using comparison images.

155.    Plaintiff told Dudley that Plaintiff wanted to talk with her about a recent development in Plaintiff's health on October 20, 2016.

156.    Plaintiff specifically discussed with Dudley, on October 20, 2016, that she wanted to take "FMLA" if her recurrence of cancer required a second surgery.

157.    Plaintiff's October 20, 2016 FMLA request was a request for post-eligible leave for a potential second surgery; as Plaintiff's second cancer surgery would have been scheduled to occur more than one year after employment commenced as measured from October 16, 2015.

158.    Plaintiff was not asking again for FMLA protection for a cancer surgery set to begin prior to her one-year anniversary.  Dudley already denied Plaintiff such FMLA leave on April 21, 2016.

159.    In point of fact, Defendants terminated Plaintiff on May 6, 2016 for requesting FMLA leave specifically in order to prevent Plaintiff from gaining such eligibility.

160.    Upon information and belief, Plaintiff had worked 1,250 hours of service in the twelve (12) months prior to Plaintiff's October 20, 2016 request for FMLA leave.

22

161.    If necessary, Plaintiff could have worked overtime or postponed the date of her surgery
until she was eligible for FMLA leave under the 1,250 hours-of-service requirement.

162.    On October 20, 2016, less than three (3) hours after Plaintiff requested FMLA leave from
Dudley due to the likelihood of a recurrence of Plaintiff's cancer, Rynkiewicz emailed Plaintiff
and cc'ed Dudley asking about the number of patient referrals for the week.

163.    The next day, on October 21, 2016, Rynkiewicz sent Plaintiff an email saying she was
given a directive that she was expected to get 10 new patients by the end of the month, and told
that she did not get any referrals that converted to a patient as of that point in October.

164.    Having not received a response about her FMLA request, on November 4, 2016, Plaintiff
asked Dudley whether she was going to be approved for FMLA.  Dudley stated to Plaintiff that
she was not eligible for FMLA because Dudley calculated Plaintiff's start date from the date of
her rehire in July 2016, as opposed to the original date of hire in October 2015.  However, this is
untrue because 29 C.F.R. § 825.110(b) states, "The 12 months an employee must have been
employed by the employer need not be consecutive months . . . ."

165.    On November 4, 2016, the same day that Plaintiff followed up on her FMLA leave
request, Rynkiewicz and Dudley placed Plaintiff on an Action Plan, to last 30 days, or until
December 4, 2016.

166.    Also on the same day, November 4, 2016, Defendants again placed the advertisement for
the position of "Home Care Account Liaison," seeking applicants with similar qualifications for
a job with a job description that closely matched Plaintiff's job description.

167.    On November 23, 2016, Plaintiff was provided a performance review, her probationary
period was extended for thirty days, and she was told that she would be reevaluated at the end of
the 30 days.

168.    On November 23, 2016, Plaintiff was told to return her performance evaluation signed,
by November 28, 2016.

169.     On November 25, 2016, Plaintiff complained to the Compliance Officer, Benjamin
Treital, that Dudley and Rynkiewicz discriminated and retaliated against her for making requests
for FMLA leave due to her cancer.

170.     On the morning on November 28, 2016, Plaintiff memorialized her complaint in an e-
mail to Mr. Treitel entitled, "Descrimination [*sic.*] Complaint," where Plaintiff stated in the e-
mail, "I requested information from Irene [Dudley] about FMLA for appointments and a
potential second surgery for my cancer.  Irene told me that I was not eligible for FMLA because
my employment restarted in July 2016.  Irene refused to calculate my eligibility from before I
was terminated due to my cancer."

171.     Plaintiff was terminated by Rynkiewicz and Dudley on the afternoon of November 28,
2016 in order to avoid having to accommodate Plaintiff with foreseeable future FMLA leave to
which she would have become rightfully eligible absent her termination.

172.     The reason that Dudley and Rynkiewicz provided for Plaintiff's discharge, on November
28, 2016, was that Plaintiff allegedly failed to meet the required number of referrals provided in
the new Job Description.

173.     A termination letter was not provided to Plaintiff at the time of her termination on
November 28, 2016.  After the meeting on November 28, 2016, Plaintiff sent an e-mail to
Rynciewikz and Dudley asking for a termination letter that confirmed Defendants were
terminating Plaintiff for allegedly not meeting the required number of referrals provided in the
new Job Description.

174.     On November 29, 2016, Defendants provided Plaintiff a termination letter, which
changed the reason for her termination to include that Plaintiff was also being terminated for
"failure to follow professional and courteous standards of conduct" and "conduct, including
disrespect to any employee or other."

175.     However, in the Plaintiff's November 4, 2016 Action Plan, Defendants stated that,

24

"Elizabeth always displays a friendly and positive attitude with staff and others in the community. Elizabeth is a professional, she promotes our agency in a positive manner in the community."

176.    Dudley and Rynkiewicz further stated in Plaintiff's termination letter that Plaintiff did not sign and return a performance review by November 25, 2016. This is false because Dudley told Plaintiff to sign and return the performance review by November 28, 2016.

177.    Dudley and Rynkiewicz also stated in Plaintiff's termination letter that she did not bring in a copy of her schedule on November 28, 2016. This is false, because Plaintiff did bring a handwritten copy of my schedule to the November 28, 2016 meeting.

178.    Plaintiff's termination letter stated that one of the "date(s) and time(s) of incident" consisted of "7/15/16," the date that Defendants rehired Plaintiff as Director of Community Relations. The new essential job function in Plaintiff's new Job Description was used as a pretext to set her up for termination.

179.    Although Plaintiff was on an Action Plan that was set to expire on December 4, 2016, and her November 23, 2016 performance evaluation stated that she would be reevaluated after 30 days, Plaintiff was instead terminated five (5) days later, before the Action Plan expired and without ever being reevaluated.

180.    No final warning or suspension was ever provided to Plaintiff, although this was available as progressive discipline to other employees instead of termination.

**WHEREFORE,** Plaintiff, Elizabeth Goodman, demands judgment in her favor and against Defendants, in an amount that will compensate Plaintiff for back pay and benefits from the time period of November 28, 2016 to the present; front pay; back and front seniority, benefits, bonuses, commissions, overtime, shift differentials, and raises Plaintiff would have received; any and all amounts of back and front benefits in the form of health insurance, 401K, paid time-off, and life insurance; other actual monetary losses including past and future medical

expenses and any other debts incurred due to a lack of necessary income from November 28,

2016 to the present; and any incidental costs or expenses associated with incurring these events

without necessary income from employment, up to a sum equal to 12 weeks of wages of salary

for Plaintiff; liquidated damages, or double damages, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

reasonable attorneys' fees, interest under 29 U.S.C. § 2617(a)(1)(A)(ii), expert witness fees, and

costs of suit; and equitable relief requiring Defendants to reinstate Plaintiff; to provide Plaintiff

back seniority and any promotions she would have received; and to place Plaintiff in the highest

appropriate position and salary range; equitable relief for Defendants to rescind the non-compete

agreement that Plaintiff was required to sign upon accepting rehire in July 2016 which requires

that Plaintiff not be employed or render services, directly or indirectly, against any organization

that provides any services which are the same or similar to Defendants' services within a ten (10)

mile radius of three (3) organizations in Philadelphia and one (1) in Bristol; equitable relief

requiring Defendants to remove any record of Plaintiff's termination from her personnel file; and

requiring Defendants to post notice of the verdict in this matter at 8301 Roosevelt Boulevard.

### COUNT VI:
### INTERFERENCE IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT ("FMLA")
### (Plaintiff, Elizabeth Goodman v. Defendants, Deer Meadows Home Health and Support Services;
### Deer Meadows Home Health and Support Services, LLC; and BHP Services)

181.    All of the foregoing paragraphs are incorporated by reference as if the same were more

fully set forth herein at length.

182.    At all times relevant hereto, each Defendant was engaged in commerce, each was in an

industry or activity affecting commerce, and each employed fifty (50) or more employees for

each working day during each of 20 or more calendar workweeks in the current or preceding

calendar year.

183.    At all times relevant hereto, Plaintiff was employed at a worksite where 50 or more

employees were employed by the employer within 75 miles of that worksite.

184.    Plaintiff was hired by Defendants on October 16, 2015, which is the date that her employment began the 12-month accrual for purposes of eligibility under the FMLA.

185.    In November/December 2015, Plaintiff began having leg pain and broke out in cutaneous lesions on her legs, called prurigo nodularis. Plaintiff was later informed by a dermatologist that her prurigo could be caused by a malignancy/cancer.

186.    In November/December 2015, Plaintiff asked one of the nurses on staff at Defendants' healthcare facility to take a look at Plaintiff's legs for her. Clinical Director and Assistant Administrator, Irene Dudley, stated to Plaintiff, "Why do you have a need to be sick?" When Plaintiff responded to Dudley that Plaintiff might be sick, Dudley said, "You always have something to complain about."

187.    In or around November/December 2015, Respondents' Head Administrator, Stanley Rynkiewicz, along with Dudley, examined a report for a chest x-ray that Plaintiff had performed to check for tuberculosis. When Dudley saw Plaintiff's chest x-ray, Dudley stated, "She is a mess" and "we should fire her now." Both Dudley and Rynkiewicz laughed.

188.    Plaintiff was diagnosed with squamous cell carcinoma of the vulva following a March 28, 2016 biopsy taken by her gynecologist. The gynecologist told Plaintiff on March 28, 2016 that he was concerned about the likelihood Plaintiff had vulvar cancer based on the fact that there was a lump on Plaintiff's vulva, and because Plaintiff had lichen sclerosus, which predisposes women to vulvar cancer. The gynecologist informed Plaintiff on March 28, 2016 that Plaintiff would need cancer surgery.

189.    A biopsy also subsequently revealed, on July 17, 2017, that Plaintiff had the diagnosis of squamous cell carcimona, or cancer, of her left leg too.

190.    After being told by her gynecologist about the likelihood she had vulvar cancer on March 28, 2016, Plaintiff returned to work the same day and informed Dudley about her cancer diagnosis and the need for cancer surgery.

27

191. On April 1, 2016, Rynkiewicz and Dudley conducted a performance evaluation of Plaintiff noting an alleged performance issue with admissions quotas for the first time.

192. Plaintiff was scheduled to undergo surgery for her vulvar cancer on Tuesday, May 10, 2016.

193. Plaintiff notified Dudley and Rynkiewicz on or about April 21, 2016 regarding the May 10, 2016 date of her cancer surgery. Plaintiff specifically requested "FMLA," and Dudley informed Plaintiff she was not eligible for FMLA.

194. On May 6, 2016, the Friday before Plaintiff's surgery the following Tuesday, May 10, 2016, Defendants discharged Plaintiff from her position as Director of Community Relations.

195. Defendants provided Plaintiff a termination letter on May 6, 2016 that stated, "This layoff action is indefinite in duration and should be considered permanent," and "I wish to assure you that your termination is not related to your job performance."

196. Plaintiff continuously and repeatedly expressed interest in rehire to her former position, to Rynkiewicz and Dudley, in June and July 2016. Rynkiewicz and Dudley did not respond.

197. On July 6, 2016, Defendants placed an advertisement online for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

198. On July 12, 2016, Plaintiff formally applied online for the position of Home Care Account Liaison.

199. Plaintiff was contacted by Rynkiewicz on July 12, 2016 and Rynkiewicz told Plaintiff that she was one of the candidates under consideration for the new position of Home Care Account Liaison.

200. Defendants then called Plaintiff on July 14, 2016, and rehired her back in her former position as Director of Community Relations, *not* Home Care Account Liaison.

201. After rehiring Plaintiff on July 25, 2016, Defendants discharged Plaintiff again on

November 28, 2016 because she was disabled, had a record of a disability, and/or because she was perceived or regarded as disabled, on account of her cancer diagnosis.

202.   On or about July 14, 2016, Rynkiewicz called Plaintiff and told her that after reinstatement as the Director of Community Relations, Plaintiff should expect to receive a bonus if she received ten (10) referrals per month.

203.   Then, on July 15, 2016, Rynkiewicz sent Plaintiff a new Job Description which included one (1) new "essential job function" – that the Plaintiff would be "directly responsible for obtaining a minimum of 12-15 new referrals a month."

204.   On July 17, 2016, Plaintiff brought up with Rynkiewicz that the number had changed from 10 referrals originally, to 12-15 referrals.  Plaintiff was assured by Rynkiewicz on July 18, 2016 that the number was actually ten (10).

205.   On July 17, 2016, Plaintiff brought up with Rynkiewicz that he had previously stated that the ten (10) referrals were for a bonus, rather than a requirement.  Plaintiff was also assured by Rynkiewicz, on July 18, 2016, that the referrals were not a job requirement, but instead were simply a goal to achieve a bonus.

206.   Rynkiewicz stated that Plaintiff was required to sign and accept the new Job Description in order to be rehired to her position as Director of Community Relations.  Plaintiff therefore signed for the new Job Description on July 18, 2016, despite the discrepancy in what was provided about the referrals in writing versus verbally.

207.   Immediately after Plaintiff started on July 25, 2016, and continuing repeatedly until Plaintiff's termination, Dudley would ask Plaintiff, "How's your energy level?" generally, "How's your energy level today?", and "How's your energy level?" for a specific assignment.

208.   Plaintiff was told by her oncologist at her 4-month follow-up oncology appointment, on October 6, 2016, that she had a possible recurrence of cancer because the oncologist stated she saw irregular cells and areas that might be malignant using comparison images.

209.    Plaintiff told Dudley that Plaintiff wanted to talk with her about a recent development in
Plaintiff's health on October 20, 2016.

210.    Plaintiff specifically discussed with Dudley, on October 20, 2016, that she wanted to take
"FMLA" if her recurrence of cancer required a second surgery.

211.    Plaintiff's October 20, 2016 FMLA request was a request for post-eligible leave for a
potential second surgery, as Plaintiff's second cancer surgery would have been scheduled to
occur more than one year after employment commenced as measured from October 16, 2015.

212.    Plaintiff was not asking again for FMLA protection for a cancer surgery set to begin prior
to her one-year anniversary.  Dudley already denied Plaintiff such FMLA leave on April 21,
2016.

213.    In point of fact, Defendants terminated Plaintiff on May 6, 2016 for requesting FMLA
leave specifically in order to prevent Plaintiff from gaining such eligibility.

214.    Upon information and belief, Plaintiff had worked 1,250 hours of service in the twelve
(12) months prior to Plaintiff's October 20, 2016 request for FMLA leave.

215.    If necessary, Plaintiff could have worked overtime or postponed the date of her surgery
until she was eligible for FMLA leave under the 1,250 hours-of-service requirement.

216.    On October 20, 2016, less than three (3) hours after Plaintiff requested FMLA leave from
Dudley due to the likelihood of a recurrence of Plaintiff's cancer, Rynkiewicz emailed Plaintiff
and cc'ed Dudley asking about the number of patient referrals for the week.

217.    The next day, on October 21, 2016, Rynkiewicz sent Plaintiff an email saying she was
given a directive that she was expected to get 10 new patients by the end of the month, and told
that she did not get any referrals that converted to a patient as of that point in October.

218.    Having not received a response about her FMLA request, on November 4, 2016, Plaintiff
asked Dudley whether she was going to be approved for FMLA.  Dudley stated to Plaintiff that
she was not eligible for FMLA because Dudley calculated Plaintiff's start date from the date of

30

her rehire in July 2016, as opposed to the original date of hire in October 2015. However, this is untrue because 29 C.F.R. § 825.110(b) states, "The 12 months an employee must have been employed by the employer need not be consecutive months . . . ."

219.    On November 4, 2016, the same day that Plaintiff followed up on her FMLA leave request, Rynkiewicz and Dudley placed Plaintiff on an Action Plan, to last 30 days, or until December 4, 2016.

220.    Also on the same day, November 4, 2016, Defendants again placed the advertisement for the position of "Home Care Account Liaison," seeking applicants with similar qualifications for a job with a job description that closely matched Plaintiff's job description.

221.    On November 23, 2016, Plaintiff was provided a performance review, her probationary period was extended for thirty days, and she was told that she would be reevaluated at the end of the 30 days.

222.    On November 23, 2016, Plaintiff was told to return her performance evaluation signed, by November 28, 2016.

223.    On November 25, 2016, Plaintiff complained to the Compliance Officer, Benjamin Treital, that Dudley and Rynkiewicz discriminated and retaliated against her for making requests for FMLA leave due to her cancer.

224.    On the morning on November 28, 2016, Plaintiff memorialized her complaint in an e-mail to Mr. Treitel entitled, "Descrimination [*sic.*] Complaint," where Plaintiff stated in the e-mail, "I requested information from Irene [Dudley] about FMLA for appointments and a potential second surgery for my cancer.  Irene told me that I was not eligible for FMLA because my employment restarted in July 2016.  Irene refused to calculate my eligibility from before I was terminated due to my cancer."

225.    Plaintiff was terminated by Rynkiewicz and Dudley on the afternoon of November 28, 2016 in order to interfere with rights that would have vested absent Plaintiff's termination.

31

226.    The reason that Dudley and Rynkiewicz provided for Plaintiff's discharge, on November 28, 2016, was that Plaintiff allegedly failed to meet the required number of referrals provided in the new Job Description.

227.    A termination letter was not provided to Plaintiff at the time of her termination on November 28, 2016. After the meeting on November 28, 2016, Plaintiff sent an e-mail to Rynciewikz and Dudley asking for a termination letter that confirmed Defendants were terminating Plaintiff for allegedly not meeting the required number of referrals provided in the new Job Description.

228.    On November 29, 2016, Defendants provided Plaintiff a termination letter, which changed the reason for her termination to include that Plaintiff was also being terminated for "failure to follow professional and courteous standards of conduct" and "conduct, including disrespect to any employee or other."

229.    However, in the Plaintiff's November 4, 2016 Action Plan, Defendants stated that, "Elizabeth always displays a friendly and positive attitude with staff and others in the community. Elizabeth is a professional, she promotes our agency in a positive manner in the community."

230.    Dudley and Rynkiewicz further stated in Plaintiff's termination letter that Plaintiff did not sign and return a performance review by November 25, 2016. This is false because Dudley told Plaintiff to sign and return the performance review by November 28, 2016.

231.    Dudley and Rynkiewicz also stated in Plaintiff's termination letter that she did not bring in a copy of her schedule on November 28, 2016. This is false, because Plaintiff did bring a handwritten copy of my schedule to the November 28, 2016 meeting.

232.    Plaintiff's termination letter stated that one of the "date(s) and time(s) of incident" consisted of "7/15/16," the date that Defendants rehired Plaintiff as Director of Community Relations. The new essential job function in Plaintiff's new Job Description was used as a

pretext to set her up for termination.

233.    Although Plaintiff was on an Action Plan that was set to expire on December 4, 2016, and her November 23, 2016 performance evaluation stated that she would be reevaluated after 30 days, Plaintiff was instead terminated five (5) days later, before the Action Plan expired and without ever being reevaluated.

234.    No final warning or suspension was ever provided to Plaintiff, although this was available as progressive discipline to other employees instead of termination.

    **WHEREFORE,** Plaintiff, Elizabeth Goodman, demands judgment in her favor and against Defendants, in an amount that will compensate Plaintiff for back pay and benefits from the time period of November 28, 2016 to the present; front pay; back and front seniority, benefits, bonuses, commissions, overtime, shift differentials, and raises Plaintiff would have received; any and all amounts of back and front benefits in the form of health insurance, 401K, paid time-off, and life insurance; other actual monetary losses including past and future medical expenses and any other debts incurred due to a lack of necessary income from November 28, 2016 to the present; and any incidental costs or expenses associated with incurring these events without necessary income from employment, up to a sum equal to 12 weeks of wages of salary for Plaintiff; liquidated damages, or double damages, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii); reasonable attorneys' fees, interest under 29 U.S.C. § 2617(a)(1)(A)(ii), expert witness fees, and costs of suit; and equitable relief requiring Defendants to reinstate Plaintiff; to provide Plaintiff back seniority and any promotions she would have received; and to place Plaintiff in the highest appropriate position and salary range; equitable relief for Defendants to rescind the non-compete agreement that Plaintiff was required to sign upon accepting rehire in July 2016 which requires that Plaintiff not be employed or render services, directly or indirectly, against any organization that provides any services which are the same or similar to Defendants' services within a ten (10) mile radius of three (3) organizations in Philadelphia and one (1) in Bristol; equitable relief

33

requiring Defendants to remove any record of Plaintiff's termination from her personnel file; and

requiring Defendants to post notice of the verdict in this matter at 8301 Roosevelt Boulevard.

## **JURY DEMAND**

Plaintiff hereby requests a jury of eight (8) members on all counts so triable.

Respectfully submitted,

DATED: 10/27/17

JUSTIN F. ROBINETTE, ESQUIRE
Attorney I.D. No. 319829
325 Chestnut Street
Constitution Place
Suite 800
Philadelphia, PA 19106-2615
Tel: (610) 212-6649
Fax: (610) 910-3200
E-mail: jrobinette@discrimlawyer.com

*Attorney for Plaintiff, Elizabeth Goodman*

34

# EXHIBIT "A"

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Elizabeth Goodman<br>140 Route 50<br>Ocean View, NJ 08230 | From: | Philadelphia District Office<br>801 Market Street<br>Suite 1300<br>Philadelphia, PA 19107 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **17G-2017-00024** | **Legal Unit** | **(215) 440-2828** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[X] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Spencer H. Lewis, Jr.,
**District Director**

August 8, 2017
*(Date Mailed)*

Enclosures(s)

cc:
DEER MEADOWS HOME HEALTH AND SUPPORT SERV.
LLC & BHP SERV.

Justin F. Robinette
325 Chestnut Street, Suite 800
Constitution Place
Philadelphia, PA 19106

Glenn R. Davis, Esq.
LATISHA DAVIS & MCKENNA, P.C.
1700 Bent Creek Blvd, Suite 140
Mechanicsburg, PA 17050